**SOCIETY OF SEPARATIONISTS, INC., et al., Plaintiffs–Appellants,**

**v.**

**Guy HERMAN, Judge of the Travis County Court at Law, et al., Defendants–Appellees.**

No. 90–8660.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1991.

John W. Vinson, Austin, Tex., for plaintiffs-appellants.

James M. McCormack, Asst. County Atty., Ken Oden, Travis County Atty., Austin, Tex., for defendants-appellees.

Before CLARK, Chief Judge, and GOLDBERG and GARWOOD, Circuit Judges.

GOLDBERG, Circuit Judge:

An atheist, summoned for jury duty in a Texas court, declined to take the required pre-voir dire oath because it included a reference to God. Offered an affirmation containing a reference to God, she continued to refuse. When she was offered the opportunity to raise her hand and be affirmed without such reference, she still declined, explaining that she considered an affirmation just as religious as an oath. The judge disagreed with her belief that such an affirmation was religious, and jailed her for contempt. Released after posting bond, the woman sued under section 1983, alleging violation of the Free Exercise Clause, and seeking damages and injunctive and declaratory relief.

We hold that the judge's actions violated the potential juror's right to Free Exercise guaranteed by the First and Fourteenth Amendments. We grant a declaratory judgment requiring a judge confronted with a similar refusal to either dismiss the potential juror without penalty or accommodate such juror's constitutionally protected beliefs by allowing the use of an alternative form of avowal that both satisfies the scruples of the juror and the requirements of the judicial system. We also consider matters of stare decisis, claim and issue preclusion, standing, and immunity.

## I. Background

On December 15, 1987, Robin Murray–O'Hair, an American Atheist, appeared for jury duty at the Travis County Courthouse, located in Austin, Texas. She refused to take the oath required of venire members before voir dire questioning, stating that she was an atheist and could not take an oath which included a reference to God. The presiding judge, Guy Herman, offered to allow Murray–O'Hair to affirm, but the affirmation still included a reference to God, and Murray–O'Hair refused. Murray–O'Hair was told to be seated and the other jurors were sworn in.

Murray–O'Hair was told to proceed to Herman's regular courtroom, where the judge again requested that she take the oath. Now accompanied by her attorney, Murray–O'Hair restated her objections and Herman offered to allow her to raise her hand and make an affirmation without any reference to "God or anything of that nature." Murray–O'Hair declined, stating that she could not affirm because an affirmation "is just as religious as an oath." Herman warned her that if she refused to take an oath or make an affirmation, he would hold her in civil contempt. Murray–O'Hair responded that she was not trying to evade her jury duty, but sought to avoid

"participating in a religious statement." The judge never inquired as to what form of assurance of truthfulness would meet Murray–O'Hair's objections. Herman and Murray–O'Hair then debated the nature of affirmations. Herman had done some legal research, based in part on cases that Murray–O'Hair had submitted to him, and he concluded that "affirmances are for atheists and other folks that do not wish to take oaths." In his view, an affirmation was not a "religious statement"; it was merely a pledge that one would give true answers to the voir dire questions and met the qualifications for jury service. Murray–O'Hair had a different view: "An affirmation, my understanding, is a religious statement." Herman responded, "The Court does not agree with you on that matter."

Murray–O'Hair continued to refuse and, ending the heretofore patient discussion, Herman ordered her jailed on the spot for a term of three days "and thereafter until you purge yourself of the contempt by taking the affirmation." She was jailed, but was released on bond approximately six hours later. She did not, or was not permitted to, resume her place in the jury pool.

Murray–O'Hair subsequently filed three separate law suits challenging Herman's actions and similar actions by other Travis County judges. First, Murray–O'Hair petitioned the Travis County district court for a writ of habeas corpus. The court denied relief, but Judge Herman subsequently commuted the contempt sentence to the six hours served. Murray–O'Hair appealed the denial of relief, but the state court of appeals dismissed the appeal as moot.[1]

Second, on August 11, 1987, Murray–O'Hair and other individual plaintiffs brought suit in federal district court against the Travis County District Court and the Texas Attorney General, alleging a continuing pattern "whereby they (1) respond as requested for jury service in the Travis County District Court, (2) refuse to take a 'God' oath, and (3) are excluded by the presiding Judge from jury service." [2] The district court dismissed for failure to state a claim. We affirmed, holding that there is no constitutionally protected right to serve on a jury and adding that "[m]oreover, ... jurors are not required to swear an oath to a deity ... an affirmation [is not] the same as an oath to a deity." [3] Neither opinion fleshes out the factual context of the plaintiffs' claims; the district court simply notes that "[t]he manner of excluding the Plaintiffs from jury service varies from incident to incident," adding without explanation that "the differences are not material." [4] Neither opinion mentions Judge Herman or refers to anyone being jailed for their refusal to swear or affirm.

Third, on November 16, 1989, Murray–O'Hair and the Society of Separationists filed this section 1983 action seeking damages and declaratory and injunctive relief against Herman, Travis County Judge Bill Aleshire, Travis County, the "Travis County court system," and the clerk, sheriff and court bailiffs of Travis County. The suit, predicated on the particular exchange between Herman and Murray–O'Hair, was styled as a class action on behalf of all individuals whose religious convictions precluded them from taking the juror oath.[5] Plaintiffs claimed that Murray–O'Hair's First and Fourteenth Amendment rights

1. See In re O'Hair, No. 3–88–044–CV (Tex.Ct. App.—Austin April 6, 1988) (unpublished opinion).

2. Murray v. Travis County Dist. Court, No. A–89–CA–1463 (W.D.Tex. Mar. 22, 1989) (unpublished opinion).

3. Murray v. Travis County Dist. Court, 898 F.2d 150 (5th Cir.) (unpublished opinion), cert. denied, —— U.S. ——, 111 S.Ct. 75, 112 L.Ed.2d 49 (1990).

4. Murray v. Travis County Dist. Court, No. A–89–CA–1463 (W.D.Tex. Mar. 22, 1989) (unpublished opinion).

5. The class is fancifully denominated as "all individuals eligible for jury service who have deep-seated convictions against mouthing any religious dogma as a condition to jury service, much less judge-dictated religious statements constituting a religious exercise."

had been violated because she was imprisoned for refusing to take a religious oath.

The district court decided the case on cross motions for summary judgment and on consideration of undisputed facts. The court: dismissed the Society as a plaintiff and denied class certification; found that all defendants were either immune, were nonexistent entities, or were otherwise improperly named; held that the earlier *Murray* decision was res judicata; dismissed plaintiffs' pendant state claims without prejudice; and imposed Rule 11 sanctions. The court later struck the award of sanctions when the defendants failed to timely submit their request for attorney's fee. The plaintiffs appealed the remaining portions of the court's order.

We hold that the previous suit does not bar this action; reinstate the Society as a plaintiff; affirm the dismissal of the defendants other than Herman; hold that Herman did violate Murray–O'Hair's Free Exercise rights; find Herman absolutely or qualifiedly immune from suit for damages; grant declaratory relief; and decline to grant an injunction.

## II. Discussion
### A. Stare Decisis and Preclusion

The government argues, and the district court held, that Murray–O'Hair's constitutional claim is barred by the res judicata effect of the earlier *Murray* decision. We disagree. We analyze the relation between *Murray* and the instant case according to principles not just of res judicata, but also stare decisis, collateral estoppel, and law of the case. From any of these perspectives,

however, *Murray* is without preclusive effect.

■ As an initial matter, we set out our rules on stare decisis, specifically, the law on the binding effect of prior panel decisions. In this circuit, one panel may not overrule the decision, right or wrong, of a prior panel in the absence of an intervening contrary or superseding decision by the court en banc or the Supreme Court.[6] Where two previous holdings or lines of precedent conflict, "the earlier opinion controls and is the binding precedent in the circuit."[7] Even a decision not necessary to support the ultimate ruling, such as an alternative holding, is binding.[8] Dicta, however, is persuasive authority only, and is not binding.[9]

In the earlier *Murray* case, Murray–O'Hair and other plaintiffs argued that they had a right to serve on juries, and that they were subjected to a continuing pattern of exclusion in violation of their rights; as the district court framed the question, "Does the practice of a State trial court in excluding from jury service persons who refuse to make an oath deny a vested interest ... [or] violate the Constitutional provision of separation of church and state?"[10] The district court found no violation, holding without citation of authority that "Plaintiffs have no Constitutionally protected interest in sitting on a jury" and that "[a] jury oath which refers to a deity does not violate" the Establishment Clause; the court analyzed the juror oath using the *Lemon* test factors (purpose, effect, and entanglement).[11] We affirmed in an unpublished decision, holding without citation that:

(earlier line of cases is *"presumptively* correct"; preference for the older authority is "clearly appropriate ... *where* [it] has been repeatedly acknowledged as the law of this circuit").

---

6. *Pruitt v. Levi Strauss & Co.,* 932 F.2d 458, 465 (5th Cir.1991); *Umphlet v. Connick,* 815 F.2d 1061, 1063 (5th Cir.1987). An exception, not relevant here, is that "a motions panel decision is not binding precedent." *Northshore Dev. v. Lee,* 835 F.2d 580, 583 (5th Cir.1988).

7. *Boyd v. Puckett,* 905 F.2d 895, 897 (5th Cir. 1990) (citing *Alcorn County v. United States Interstate Supplies,* 731 F.2d 1160, 1166 (5th Cir. 1984)), *cert. denied,* —— U.S. ——, 111 S.Ct. 526, 112 L.Ed.2d 537; *United States v. Gray,* 751 F.2d 733, 735 (5th Cir.1985). However, the rule is not always formulated in such absolute terms. *See Alcorn,* 731 F.2d at 1166 (emphasis added)

8. *Pruitt,* 932 F.2d at 465.

9. *O'Dell v. North River Ins. Co.,* 614 F.Supp. 1556, 1559 (D.La.1985).

10. *Murray v. Travis County Dist. Court,* No. A–89–CA–1463 (W.D.Tex. Mar. 22, 1989) (unpublished opinion).

11. *Id.*

[T]he district court dismissed the case because the plaintiffs failed to state a claim upon which relief can be granted. Specifically, the district court determined that because the right to serve on a jury is not a constitutionally protected one, the plaintiffs' cause of action had failed to state a claim. We agree. The occasion to serve on a jury is undeniably a duty, a privilege, and an opportunity for many citizens to actively and personally serve their government. Indeed, the opportunity for many citizens to serve on a jury might be the *only* opportunity they have to serve their government. Even so, jury service has not been construed as a constitutionally protected right.

Moreover, as the plaintiffs concede, jurors are not required to swear an oath to a deity; rather, jurors are free to simply make an affirmation that the testimony which they are about to present will be the truth. An affirmation is no more than a solemn declaration made under the penalties of perjury. We do not consider, as plaintiffs would have us do, an affirmation to be the same as an oath to a deity.[12]

Thus, the "Moreover" language in *Murray* suggests that, for Establishment Clause purposes, an affirmation is not to be considered to have a religious nature and its use in the courtroom therefore constitutes no violation of that clause.

A year later, in *Ferguson v. Commissioner*, 921 F.2d 588 (5th Cir.1991), we held that the tax court violated the *Free Exercise* Clause, and improperly construed Fed. R.Evid. 603, by requiring a witness to take an oath or affirmation, where the witness felt that an affirmation had a religious nature inconsistent with her own faith. We explained that "the protection of the free exercise clause extends to all sincere religious beliefs; courts may not evaluate religious truth."[13] That is, the plaintiff's sincere belief that an affirmation has a religious nature is sufficient to implicate free exercise concerns.[14] *Ferguson*'s discussion is plenary and replete with citations.

■ In light of the law on prior panel decisions, we must decide whether *Murray*'s comment on the jury oath casts doubt on *Ferguson* or otherwise serves as binding precedent in the instant case. We hold that it does not. For one thing, this language, bare of citation and argument,[15] is of no decisional value;[16] it is simply obiter dicta.

■ More significantly, *Murray* was an Establishment Clause case; our case, and *Ferguson*, are Free Exercise challenges. The two kinds of cases are governed by altogether different legal standards.[17] Even the question of the religious nature of an affirmation is distinct under these two clauses; as *Murray* and *Ferguson* suggest, our inquiry in Establishment Clause cases is whether a "reasonable observer" might construe the affirmation as religious,[18] whereas the Free Exercise query is whether *this particular plaintiff* holds a sincere belief that the affirmation is religious.[19] These inquiries are distinct,

---

**12.** *Murray v. Travis County Dist. Court,* 898 F.2d 150 (5th Cir.) (unpublished opinion), *cert. denied,* —— U.S. ——, 111 S.Ct. 75, 112 L.Ed.2d 49 (1990).

**13.** *Id.* at 589.

**14.** *Id.*

**15.** The obliqueness of this language is highlighted by an inconsistency between the district and appellate decisions: the former refers to the jury oaths as including a reference to God, while the latter refers to affirmations without such references.

**16.** Indeed, since the *Murray* decision is unpublished, the entire opinion is considered to have "no precedential value," although it is "precedent." 5th Cir.R. 47.5.1, 47.5.3.

**17.** *Compare Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) *and County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 109 S.Ct. 3086, 3100, 3101, 3119, 3124, 106 L.Ed.2d 472 (1989) (Establishment Clause) *with Employment Div. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990) (citing cases) (Free Exercise).

**18.** *See Allegheny,* 109 S.Ct. at 3115, 3123, 3127 (reasonable observer test).

**19.** *Ferguson,* 921 F.2d at 589.

as the Free Exercise Clause protects even an *un*reasonable belief that an affirmation is religious, so long as the belief is not "so bizarre, so clearly nonreligious in motivation." [20] Accordingly, *Ferguson* is the applicable precedent.

■ As to claim preclusion (res judicata), our rule is that the earlier suit is res judicata if, *inter alia*, "the parties [are] identical in both suits." [21] This condition is not met here: Herman was not a defendant in the first suit,[22] nor was he in privity with one: the institutional defendant in the first case was the Travis County *District* Court, but Herman serves on the Travis County *Probate* Court, which is a redesignated Travis County *Court at Law*. The Probate Court and the County Courts at Law are altogether separate courts from the District Courts.[23] Hence, *Murray* is not res judicata.

As to issue preclusion (collateral estoppel), we note that "for a prior judgment to have preclusive effect as to a particular issue, the doctrine of collateral estoppel requires that: (1) the issue at stake be identical to the one involved in the prior litigation; (2) that the issue has been actually litigated in the prior litigation; and (3) that the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action." [24] None of these conditions are met here: as discussed above, a Free Exercise claim is altogether different from an Establishment Clause claim, and *Murray*'s discussion of the jury oath is not a "critical

**20.** *Thomas v. Review Bd.*, 450 U.S. 707, 714–15, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) ("The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task.... However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection"); *Ferguson*, 921 F.2d at 589 (citations omitted) ("The protection of the free exercise clause extends to all sincere religious beliefs; courts may not evaluate religious truth").

**21.** *Nilsen v. Moss Point*, 701 F.2d 556, 559 (5th Cir.1983) (en banc) (citation and quotation omitted); *see also Foret v. Southern Farm Bureau Life Ins. Co.*, 918 F.2d 534, 539 (5th Cir. 1990) (quoting *Nilsen*). The other requisites are that the same cause of action was involved in both cases, the prior judgment was rendered by a court of competent jurisdiction and that it was a final judgment on the merits. *Nilsen*, 701 F.2d at 559.

**22.** The *Murray* defendants were the Travis County District Court and the Texas Attorney General, Jim Mattox.

It is not at all clear that the "Travis County District Court" is a legal entity. For one thing, there are five separate district courts in Travis County. *See* Tex.Gov't Code Ann. §§ 24.-155, .200, .228, .248, .264 (Vernon 1988). None appear to be called "the Travis County District Court"; rather, they are denominated as, for example, the "53rd District Court."

Further, it seems unlikely that the concept of a single entity encompassing the various district courts of a county is consistent with Texas law. Considering an analogous question in the case before us, the court below found that defendant "Travis County Court System" was not a "legal

entit[y]." This finding was based on an affidavit from Judge Michael Schless, Local Administrative Judge of the Travis County Courts at Law, who explains:

There is no entity known as the Travis County Court System. There are six County Courts at Law in Travis County, numbered 1, 2, 3, 5, 6, and 7. Each is an individual autonomous entity and the judge of each is a separately elected public official. Each judge is authorized by law to sit for the other and the courts are linked administratively by a scheme spelled out in the Government Code.

Effective October 1, 1987, County Court at Law, No. 4 was redesignated Probate Court, No. 1 and Judge Guy Herman became the judge of that Court. None of the events described in Plaintiffs Original Complaint preceded this statutory change and, therefore, none of those events involved any judge of any County Court at Law in Travis County.

The district courts appear to be similarly independent of each other. *See* Tex.Gov't Code Ann. §§ 24.001–.021 (Vernon 1988 & Supp.1991).

In addition, from the record before us, we have no indication that the "Travis County District Court" participated in the *Murray* suit. We know only that the motion to dismiss was filed by the other defendant, the Texas Attorney General.

**23.** *Compare* Tex.Gov't Code Ann. §§ 24.-007, .008, .155, .200, .228, .248, .264 (Vernon 1988 & Supp.1991) (describing district courts in general and Travis County District Courts in particular) *with id.* at §§ 25.-0003, .0021, .2291, .2292 (Probate Court and County Courts at Law).

**24.** *Meza v. General Battery*, 908 F.2d 1262, 1273 (5th Cir.1990) (citations omitted).

and necessary part" of the decision.[25]

■ Further, the *Murray* district court's reduction of the facts to a skeletal "fact pattern,"[26] coupled with the differences in parties and causes of action, makes evident that the "issue" here is a pure question of law, not one of fact or of rights between parties. In this circuit, pure questions of law are subject to collateral estoppel, but only where there is no "change in controlling legal principles between the two decisions."[27] Here, if *Ferguson* and *Murray* are considered to be in conflict, then *Ferguson* represents a drastic change in applicable law. Accordingly, *Murray* does not provide a basis for collateral estoppel of Murray–O'Hair's claims.

■ Finally, for the sake of completeness, we mention law of the case. This doctrine is applicable only "during the pendency of ... a *single proceeding,* and operates to foreclose re-examination of decided issues either on remand or on a subsequent appeal."[28] *Murray* and the case before us are altogether separate proceedings, so law of the case is inapplicable.[29]

### B. Parties

#### i. Plaintiffs

■ The district court dismissed the Society as a plaintiff because the Society failed to satisfy the prerequisites of a class action suit as enumerated in Fed.R.Civ.P. 23. In so doing, the court improperly conflated the concepts of class certification and associational standing. In *O'Hair v. White,* 675 F.2d 680, 691–92 (Former 5th Cir.1982) (en banc), we held that Society was a proper plaintiff because it was an organization suing on behalf of its members with respect to the deprivation of their voting rights under Texas law. For the same reasons set out in that opinion, we conclude that the Society has associational standing to assert the rights of its members not to be imprisoned for refusing what is in their eyes a religious affirmation.

An altogether separate question is whether the district court ought to have certified this suit as a class action. In dismissing the Society as a plaintiff, it implicitly declined to do so. The plaintiffs have not pressed an appeal on this issue, and we see no need to rule on the matter.

#### ii. Defendants

■ The district court found that all defendants other than Herman were either immune,[30] were nonexistent entities, or were otherwise improperly named. We agree, and affirm sections IV, VI, VII and

---

25. *Cf. Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1168–73 (5th Cir. Unit A 1981) (unappealed alternate grounds of decision do not have offensive collateral estoppel effect; rejecting in part the "alternative ground" rule that "if a court decides a case on two grounds, each is a good estoppel," and adopting position of Restatement of Judgments). *See generally Restatement (Second) of Judgments* § 27 & comment h; C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4421, at 206–08 (1981 & Supp.1991).

26. *See supra* sec. I.

27. *Hicks,* 662 F.2d at 1167; *see also Restatement (Second) of Judgments* § 28(2)(b). *See generally id.* comment c; C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4425, at 242–55 & n. 1 (1981 & Supp.1991).

28. *Pegues v. Morehouse Parish School Bd.,* 706 F.2d 735, 738 (5th Cir.1983) (emphasis added; quotations and citations omitted); *Schexnider v.*

*McDermott Int'l, Inc.,* 868 F.2d 717, 718 (5th Cir.1989) (emphasis added) ("The decision of a legal issue by an appellate court establishes the 'law of the case' and must be followed in all subsequent proceedings in the *same case* at both the trial and appellate levels" subject to certain exceptions), *cert. denied,* ⸺ U.S. ⸺, 110 S.Ct. 150, 107 L.Ed.2d 108.

29. In addition, we provide an exception to law of the case where "the controlling authority has since made a contrary decision of law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Gates v. Shell Offshore, Inc.,* 881 F.2d 215, 217 (5th Cir.1989), *cert. denied,* ⸺ U.S. ⸺, 110 S.Ct. 1320, 108 L.Ed.2d 495 *Ferguson* would trigger this exception, since it is contrary to the *Murray* dicta.

30. The district court also found that Judge Herman was immune. We agree, and discuss this matter *infra* sec. II.D.i.

IX of the court's opinion for the reasons stated therein.[31]

## C. Constitutional Claim

■ Religious freedom is a primal guarantee of our Constitution, and any government action that compels the expression of religious adherence is suspect. Such religious involvement by government is almost unqualifiedly prohibited.

We begin our analysis of this issue with the familiar proposition that "no official, high or petty, can prescribe what shall be orthodox in ... religion, or other matters of opinion or force citizens to confess by word or act their faith therein."[32] Our Constitution protects not just the right to speak, but the right to "refrain from speaking ... the right of individuals to hold a point of view different from the majority and to refuse to foster ... an idea they find morally objectionable."[33] These principles, although bottomed on the First Amendment's Free Speech Clause, developed in response to religiously-motivated objections to coerced speech.[34] Not sur-

prisingly, the Supreme Court has found the same principle embodied in the Free Exercise Clause: "The Free Exercise Clause ... means ... [that the] government may not compel affirmation of religious belief."[35]

■ The Free Exercise Clause extends its protection to "all sincere religious beliefs";[36] it is of no moment that a belief might not be "acceptable, logical, consistent, or comprehensible to others."[37] Accordingly, we have little trouble concluding that Judge Herman's attempt to coerce Murray–O'Hair to take an affirmation, despite her sincere religious objections, was a violation of the Free Exercise Clause.[38]

It is true that Free Exercise jurisprudence admits an exception for claims "so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause."[39] But Murray–O'Hair's claim—that a God-free affirmation is nonetheless a "religious statement," hence objectionable—is not this far-fetched. The fact that she is not alone in

---

31. With respect to defendant Travis County, we add that the County cannot be susceptible to liability under § 1983, because Judge Herman's actions effectuated a policy of the State of Texas, not Travis County. *See Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980) (county not liable for actions of Texas county judge that effectuate state rather than county policy; state statutes embody state, not county, policy); Tex. Code Crim.Proc.Ann. art. 35.02 (prescribing oath); Tex.R.Civ.P. 226 (same).

32. *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).

33. *Wooley v. Maynard,* 430 U.S. 705, 714, 715, 97 S.Ct. 1428, 1435, 1435, 51 L.Ed.2d 752 (1977).

34. *See Barnette,* 319 U.S. at 629, 63 S.Ct. at 1181 (Jehovah's Witnesses objecting on religious grounds to requirement that their children salute the flag in public school); *Wooley,* 430 U.S. at 707, 713, 97 S.Ct. at 1431, 1434 (Jehovah's Witnesses objecting on religious grounds to required display of phrase "Live Free or Die" on New Hampshire license plate); *Bowen v. Roy,* 476 U.S. 693, 704–05, 106 S.Ct. 2147, 2154–55, 90 L.Ed.2d 735 (1986) (citing *Barnette* ) ("In cases upholding First Amendment challenges ... the Court has often relied on the showing that compulsion of certain activity with religious significance was involved"); *Employment Div. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 1601, 108

L.Ed.2d 876 (1990) (*Wooley* and *Barnette,* although "decided exclusively upon free speech grounds, ... also involved freedom of religion").

35. *Smith,* 110 S.Ct. at 1599 (citing *Torcaso v. Watkins,* 367 U.S. 488, 493, 495, 81 S.Ct. 1680, 1682, 1683, 6 L.Ed.2d 982 (1961) (quotations omitted) ("neither a State nor the Federal Government can constitutionally force a person to profess a belief or disbelief in any religion") (quoting *Everson v. Board of Educ.,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947)). *See also Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963) (citing *Torcaso* ) (Free Exercise Clause does not allow government to "compel affirmation of a repugnant belief").

36. *Ferguson,* 921 F.2d at 589.

37. *Thomas,* 450 U.S. at 714, 101 S.Ct. at 1430.

38. *Cf. Moore v. United States,* 348 U.S. 966, 75 S.Ct. 530, 99 L.Ed. 753 (1955) (court erred in refusing to accommodate religious objection to use of the word "solemnly" in affirmation; "[t]here is no requirement that the word solemnly be used in the affirmation"), *rev'g* 217 F.2d 428, 430–31 (1954).

39. *Thomas,* 450 U.S. at 715, 101 S.Ct. at 1430.

her views on affirmations [40] is evidence of this,[41] as are statutory references that merge the concepts of oath and affirmation.[42] Law dictionaries too define *affirmation* interchangeably with *oath:* both Black's and Bouvier's provide one definition of the term as a "solemn *religious* asseveration in the nature of an oath." [43] While the religious connotations of an oath probably seem stronger to most observers, that is not license to dismiss Murray–O'Hair's view of affirmations as unentitled to Free Exercise protection; to her and others, affirmation has become a surrogate word that is suspect because of its traditional association with religion. As Murray–O'Hair's claim is not "bizarre [or] clearly non-religious in motivation," we conclude that it is entitled to the protection of the Free Exercise Clause.

Nor can Murray–O'Hair's objections be dismissed as trivial, in the way that one might dismiss a Free Exercise challenge to the presence of "In God We Trust" on U.S. coins and bills. An affirmation is a public attestation, "readily associated with" the speaker, whereas "currency is generally carried in a purse or pocket and need not be displayed to the public. The bearer of currency is thus not required to publicly advertise the national motto." [44] Moreover, an affirmation requires that the speaker herself actually utter the words she finds objectionable, while the motto on

currency coerces neither audible speech nor visible display. A speaker's voice and mannerisms are personal to her, while currency is utterly fungible. The personal, public, and active nature of a coerced affirmation renders it far from trivial, and readily distinguishable from a greenback aphorism.

Our holding in this case is consistent with a recent Supreme Court case on the Free Exercise Clause, *Employment Div. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the Court rejected a Native American's religious objection to a law criminalizing peyote use, holding that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " [45] However, the Court reaffirmed the principle that "[t]he government may not compel affirmation of religious belief" and observed that "we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action [in cases involving] the Free Exercise Clause in conjunction with other guarantees, such as freedom of speech." [46] Thus, *Smith* specifically excepts religion-plus-speech cases from the sweep of its holding.

We note in passing that other sources define the word without reference to religion. *See* 67 C.J.S. Oaths & Affirmations § 2, at 6; *Webster's Third New International Dictionary* 35 (unabridged ed. 1967); *Webster's Ninth New Collegiate Dictionary* 61 (1990); I *Oxford English Dictionary* 40 (compact ed. 1971); *American Heritage Dictionary of the English Language* 22 (New College ed. 1976); 1 Encyc. Brit. 233 (1965); 16 Encyc. Brit. 815–16 (1965).

---

**40.** *See Ferguson,* 921 F.2d at 588 ("swear" and "affirm" both repugnant to witness for religious reasons); *Gordon v. Idaho,* 778 F.2d 1397, 1399–400 (9th Cir.1985) (same); *cf. Moore,* 217 F.2d at 430–31 (member of the Harshmanite church declined due to religious scruples to use the word "solemnly" in affirmation).

**41.** *See United States v. Lee,* 455 U.S. 252, 257 n. 6, 102 S.Ct. 1051, 1055 n. 6, 71 L.Ed.2d 127 (1982) (Burger, J.) (Amish objection to Social Security program and payroll taxes could not be held bizarre in light of similar challenge from member of Sai Baba faith).

**42.** *See* Tex.Penal Code Ann. § 1.07(a)(22) (definitions) (" 'Oath' includes affirmation"); 1 U.S.C. § 1 (same).

**43.** *Black's Law Dictionary* 29 (abr. 5th ed. 1983) (emphasis added). *See also Black's Law Dictionary* (definition of *affirmation* ) (6th ed.) (available on Westlaw); 1 *Bouvier's Law Dictionary* 160 (1914).

**44.** *See Wooley,* 430 U.S. at 717 n. 15, 97 S.Ct. at 1436 n. 15 (distinguishing coerced public speech—requirement that license plate bear state motto "Live Free or Die"—from use of currency bearing motto 'In God We Trust' ").

**45.** *Id.* 110 S.Ct. at 1600 (citing *Lee,* 455 U.S. at 263 n. 3, 102 S.Ct. at 1054 n. 3 (Stevens, J., concurring in the judgment)).

**46.** *Id.* 110 S.Ct. at 1599, 1601.

Notwithstanding the broad language of the Supreme Court's pre-*Smith* precedent, it might be argued that some limits are necessary, even in religion-plus-speech cases, in order to ensure that accommodating the individual's religious belief does not "radically restrict the operating latitude" of the government.[47] Whether such a restriction is required as a matter of precedent is a matter we do not decide.[48] Nonetheless, we willingly set such a limit in the instant case, because it is clear, for example, that an outright refusal to make *some* kind of pledge[49] would frustrate the operation of the judicial system. In any event, Murray–O'Hair did not exceed these limits. She indicated that she was willing to serve her jury duty, but the judge, rather than asking her what sort of pledge she could make, instead debated the correctness of her religious beliefs. In the declaratory relief that we grant,[50] we set forth a more proper approach.

Although we have reasoned here from first principles, we observe that our holding in this case is compelled by our own precedent as well. In *Ferguson v. Commissioner*, 921 F.2d 588 (5th Cir.1990), we held that the tax court violated the Free Exercise Clause by failing to accommodate a witness's religious objection to a God-free affirmation: "[The district court] erred not only in evaluating Ms. Ferguson's religious belief, and concluding that it did not violate any 'recognizable religious scruple,' but also in conditioning her right to testify and present evidence on what she perceived as a violation of that belief."[51] This holding is equally applicable to Murray–O'Hair's case.

### D. Remedy

#### i. Damages

■ Murray–O'Hair seeks damages on account of Herman's actions. We find that Herman is absolutely or qualifiedly immune from suit for damages.

■ A judge is absolutely immune from suit for damages resulting from any act of a judicial nature.[52] In determining the judicial nature of an act, we inquire whether: (1) the act complained of is a normal judicial function; (2) the events occurred in the judge's court or chambers; (3) the controversy centered around a case then pending before the judge, and (4) the confrontation arose directly and immediately out of a visit to the judge in his judicial capacity.[53]

The district court correctly found that Herman was judicially immune from attack on the basis of his issuing a judgment of

---

**47.** *Lee*, 455 U.S. at 259, 102 S.Ct. at 1056 (quotations omitted).

**48.** *Lee* involved the Social Security tax laws, not a restriction on speech. *See id.* at 254, 102 S.Ct. at 1053.

**49.** Or oath, affirmation, promise, vow, adjuration, asseveration, avowal, declaration, or commitment. In such matters, some judicial systems apparently have a flexibility quite literally beyond words:

> With the sophistication derived from England's role as a world trader, its courts have permitted Chinese to break a saucer, a Mohammedan to bow before the Koran and touch it to his head and a Parsee to tie a rope around his waist to qualify them to tell the truth.

*United States v. Looper*, 419 F.2d 1405, 1407 n. 4 (4th Cir.1969) (citing 6 Wigmore, *Evidence* § 1818 [, at 391–92 (Chadbourne Rev.1976) ] ).

**50.** *See infra* sec. II.D.ii.

**51.** *Id.* at 590–91. Other cases from this and other circuits have reached similar conclusions.

*See O'Hair*, 675 F.2d at 691 (holding that, for standing purposes, a potential juror who would not swear to her belief in God "is ... aggrieved by being excluded from jury duty because of her lack of religious belief"); *Nicholson v. Board of Commrs. of Alabama State Bar Ass'n*, 338 F.Supp. 48, 58 (M.D.Ala.1972) (three-judge district court) (statutory oath required for admission to bar, containing words "so help me God," violates Free Exercise Clause); *Gordon*, 778 F.2d at 1401 (party cannot be required to give oath or affirmation against his religious beliefs without inquiry by court as to less offensive alternatives); *Looper*, 419 F.2d at 1407 (reversing conviction where defendant was not allowed to testify because he objected to use of God's name in affirmation).

**52.** *Brewer v. Blackwell*, 692 F.2d 387, 396 (5th Cir.1982); *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988).

**53.** *Brewer*, 692 F.2d at 396–97 (citations omitted).

contempt. Issuing a judgment of contempt is a normal judicial function;[54] Herman issued the order in his court; the voir dire process centered on some case or cases for which Judge Herman evidently had some judicial responsibility; and the controversy occurred during and arose directly and immediately out of a visit to Judge Herman in his judicial capacity.

■■■ However, as Murray–O'Hair and the district court point out, one can view this controversy through a different lens, and focus on Herman's attempt to compel Murray–O'Hair to take a juror affirmation, rather than his subsequent decision to jail her for her refusal. Viewed in this fashion, Herman's actions are less clearly entitled to absolute immunity, because the Supreme Court has implied that the selection of jurors is not an act of a judicial nature.[55]

Even if outside the scope of absolute immunity, Herman's attempt to administer an affirmation is protected by qualified immunity, as the district court concluded. We have held that

> [p]ublic officials are ... immune from liability unless their conduct violates a clearly established constitutional or statutory norm, a question not necessarily answered by the certainty of the legal rule. An official enjoys qualified immunity if a reasonable official would be left uncertain of the application of the standard to the facts confronting him.[56]

Here, we readily conclude that the unlawfulness of Herman's actions would not be apparent to a reasonable official, as statutes and rules commonly provide[57] that affirmations be offered as an alternative to oaths, under the evident and long-standing[58] assumption that this alternative is sufficient to meet the concerns of those with religious objections to oaths.[59] Thus,

---

**54.** *See Adams v. McIlhany,* 764 F.2d 294, 298 (5th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986); *Liles v. Reagan,* 804 F.2d 493, 495 (8th Cir.1986).

**55.** *See Ex parte Virginia,* 100 U.S. 339, 348, 25 L.Ed. 676 (1880) (judge not immune from criminal charge for race discrimination in jury selection, because "duty of selecting jurors might as well have been committed to a private person as to ... a judge.... That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, & c. Is their election or appointment a judicial act?"), *quoted in Forrester,* 108 S.Ct. at 544–45.

**56.** *Hopkins v. Stice,* 916 F.2d 1029, 1030–31 (5th Cir.1990) (citing *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)).

**57.** *See, e.g.,* Fed.R.Evid. 603 advisory committee note (rule providing for affirmations in lieu of oaths "is designed to afford the flexibility required in dealing with religious adults [and] atheists...."); *see also* U.S. Const. art. II, § 1, cl. 8 (upon assuming office, President "shall take the following Oath or Affirmation: 'I do solemnly swear (or affirm) ...' "), art. VI, cl. 3 (legislative, executive, and judicial officers of federal and state governments "shall be bound by Oath or Affirmation" to support the Constitution); 1 U.S.C. § 1 (providing for affirmation in lieu of oath); Fed.R.Civ.P. 43(d) (permitting "solemn affirmation" in lieu of oath); Fed.R. Bankr. 9012(b) (same); 28 U.S.C. §§ 459, 953 (empowering justices, judges, clerks, and deputy clerks to administer "oaths and affirmations");

Tex.Penal Code Ann. § 1.07(a)(22) (definitions) (" 'Oath' includes affirmation"); Tex. Const. art. I, § 5 (referring to "oaths or affirmations"); Tex.Rev.Civ.Stat.Ann. art. 25 (similar).

**58.** *See, e.g.,* 7 & 8 Will. 3, ch. 34 (1695) ("every Quaker ... shall instead of the usual Forme be permitted to make his or her Solemne Affirmation or Declaracion" in prescribed form, which included reference to God) (*quoted in part in* I *Oxford English Dictionary* 40 (compact ed. 1971)); *McIntire's Case,* 16 F.Cas. 151 (C.C.D.C. 1803) (No. 8,824) (juror who was not a Quaker and "not attached to any particular religious sect" was not permitted to affirm); *Bryan's Case,* 4 F.Cas. 506 (C.C.D.C.1804) (No. 2,063) (Methodist juror, who had previously been sworn on juries and who did not know whether being sworn was contrary to Methodist principles to be sworn, was not permitted to affirm); *Bank of Columbia v. Wright,* 2 F.Cas. 647 (C.C.D. C.1827) (No. 883) (witness who generally worshiped with, but was not member of, Quakers, was not permitted to affirm; construing Maryland statute applicable by its terms only to Quakers and other specified sects); *King v. Fearson,* 14 F.Cas. 520 (C.C.D.C.1829) (No. 7,790) (witness, who worshiped with Quakers, whose application for membership was pending, and who was regarded in some respects as member, was permitted to affirm).

**59.** That an assumption is both old and familiar does not make it correct, but these characteristics do increase the likelihood that a reasonable official could be ignorant of the assumption's falsehood.

Herman enjoys qualified if not absolute immunity.

### ii. Declaratory Relief

 Immunity does not, of course, insulate Herman from the reach of our equitable power. Indeed, the grant of immunity from damages for constitutional error makes the grant of declaratory relief more, not less, equitable.

 Therefore, we declare that when a judge is confronted with a prospective juror's refusal, on grounds of constitutionally protected beliefs, to swear or affirm to answer voir dire questions truthfully, the judge should either allow the person to withdraw from jury duty without penalty or allow the prospective juror an alternative that requires him or her to make some form of serious public commitment to answer truthfully that does not transgress the prospect's sincerely held beliefs. The judge may require a prospective juror to state: (1) the specific basis for objection, and (2) what form of serious public commitment would accord with the prospective juror's constitutionally protected beliefs. The judge may require any form of avowal that "states[s] or symbolize[s] that [the witness will] tell the truth and which ... purports to impress upon [her] the necessity for so doing."[60] Nothing more may be compelled if it impinges upon sincere, constitutionally protected beliefs. It is not for the judge to determine the validity or logic of the prospective juror's beliefs. Beliefs may be rejected only if they are patently insincere, bizarre, or not related to the free exercise of religion. If the prospective juror is unwilling to make a required avowal

of the type stated, the judge may impose such penalty as may be provided by law for refusal to perform jury duty.

### iii. Injunction

 Having granted declaratory relief, we see in this case no reason to issue an injunction as well. Considerations of comity and decorum, similar to those present in *Younger* abstention contexts,[61] suggest that we enjoin state judges only where necessary to secure compliance with our decisions.[62] Here, we have no reason to suppose that our declaratory judgment would be inadequate, should the circumstances of this case arise again. Accordingly, we exercise our discretion and decline to grant injunctive relief.[63]

### III. Conclusion

It is written that one need only "render ... unto Caesar the things that are Caesar's."[64] Among those things are jury service and truthful testimony. But in assembling juries and in seeking the truth[65], Caesar's judiciary is constrained by the Constitution. While black-robed centurions may exact some pledge of veridicality, they may not require a protesting citizen to utter what is to her an expression of religious faith. As our accompanying footnotes attest, judges may choose, with restraint, to tincture their text with a religious reference or two; but they may not, in even a seemingly minimal fashion, compel others to do likewise. The Constitutional sin is in compulsion, not in expression.

We acknowledge the popular view that affirmation-taking is not a religious exer-

---

**60.** *Looper,* 419 F.2d at 1407. *See also* Fed.R. Evid. 603. This rule, although not itself applicable to state proceedings, is instructive. *See also Madeley v. Kern,* 488 F.2d 865, 866 (5th Cir. 1974) (citing *Craig v. State,* 480 S.W.2d 680, 686 (Tex.Cr.App.1972)); and *O'Hair,* 675 F.2d at 695.

**61.** *See Younger v. Harris,* 401 U.S. 37, 44–45, 91 S.Ct. 746, 750–51, 27 L.Ed.2d 669 (1971) (discussing "Our Federalism").

**62.** *See Pulliam v. Allen,* 466 U.S. 522, 528, 104 S.Ct. 1970, 1973, 80 L.Ed.2d 565 (1984) ("injunctive relief against a judge rarely is awarded"); *id.* at 539 & n. 20, 104 S.Ct. at 1979 & n. 20

("comity and federalism ... [counsel] restraint by federal courts called on to enjoin the actions of state judicial officers"); *Wooley,* 430 U.S. at 711–12, 97 S.Ct. at 1433–34 (although practical effect of declaratory and injunctive relief is ordinarily virtually identical, court can generally protect plaintiff's interests with a declaratory judgment, rendering injunction unnecessary).

**63.** *See Nicholson,* 338 F.Supp. at 59.

**64.** Matthew 22:21.

**65.** *Cf.* John 8:32 ("and ye shall know the truth, and the truth shall make you free").

cise, but we do not labor within a majoritarian jurisprudence. Our responsibility is to apply not the majority ethos, but the Constitution. That great document enforces no religious orthodoxy; it permits no compelled religious expression. Its provisions protect not just the popular, but also the un-; not just the sensible, but also the (seemingly) silly. In return, the Constitution repays our investment of tolerance with a dividend of individual autonomy and social freedom—freedom, in great measure, from the religious hostilities and petty oppressions that have rent nations throughout history and across the globe. An unconventional pledge is a small price to pay for liberty of conscience, for, when we enforce Murray–O'Hair's rights, ultimately, we enforce our own as well.

In holding that Judge Herman erred, we do not mean to say that he was not courteous and thoughtful. He apparently was, at least up until his perhaps intemperate decision to jail Murray–O'Hair.[66] But he was not sufficiently knowledgeable with regard to the primacy of the Constitutional guarantee of Free Exercise, which is to be watched, policed and rarely if ever trespassed. The judge's duty was to fashion statements of commitment to truth and integrity in the jury box and the jury room, and to do everything that would make for absolute integrity. The juror must be able to articulate her commitment to rectitude and truth finding as a juror without bias or prejudice. The judge had a duty to fashion a statement for the prospective juror so that she could elucidate these concepts. This he failed to do.

We say that what the judge did was error, but it was not an intentional evil.

Our decision should be understood not as chastisement by any means, but as exhortation—a reminder that the Free Exercise Clause requires something more; here, a back-and-forth interaction designed to elicit positive cooperation from a protesting juror or witness.

For the reasons stated in this opinion we reinstate the Society as a plaintiff; AFFIRM the district court's dismissal of defendants other than Herman; AFFIRM the district court's denial of damages and injunctive relief; and grant declaratory relief as set forth above. We REMAND to allow the district court to decide whether to exercise jurisdiction over Murray–O'Hair's pendant state claims, and for further proceedings not inconsistent with this opinion.[67]

GARWOOD, Circuit Judge, dissenting.

I respectfully dissent.

I join my colleagues in their reverence for our nation's Constitution. And I accordingly believe that what the Constitution says on the subject of oaths and affirmations should be at least the starting point for our consideration. The Constitution speaks to this subject in several places, most prominently in clause 3 of Article VI:

"The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall *be bound by Oath or Affirmation* to support this Constitution; *but no religious Test shall ever be required* as a Qualification to any Office or public Trust under the United States." (Emphasis added).[1]

**66.** We note that the contempt sanction vastly exceeds the penalty to which Murray–O'Hair would have been subject had she simply failed to appear for jury service. *See* Tex. Gov't Code Ann. § 62.111 (maximum $100 fine for failure to attend court for impaneling); *see also* Tex. Code Crim.Proc.Ann. art. 35.01 (maximum $50 fine for juror's failure to appear at start of trial when name called).

**67.** Because this opinion concerns an affirmation without any reference to God, we have no occasion to consider the scope and constitutionality of the Texas rules which require that the oaths

administered to jurors conclude with the phrase "so help you God." *See* Tex.Code Crim.Proc. Ann. arts. 19.34 (grand jurors), 35.02 (venire), 35.22 (impaneled jurors); Tex.R.Civ.P. 226 (venire), 236 (impaneled jurors); *Craig v. State,* 480 S.W.2d 680, 682–84 & n. 6 (Tex.Crim.App. 1972); *Madeley v. Kern,* 488 F.2d 865, 866 (5th Cir.1974); *O'Hair,* 675 F.2d at 695.

**1.** Other references to oath or affirmation are: Article I, section 3, clause 6, providing that when the Senate tries impeachments "they shall be on Oath or Affirmation"; Article II, section 1, clause 8, providing that the President "shall take

It would thus appear that the Constitution recognizes that affirmations, as distinguished from oaths, are not religious tests, that government officers *must* be required to take either an oath or affirmation,[2] and, by implied extension, that requiring witnesses, jurors, or the like to do so is perfectly proper.

The Constitution does not speak to the exact form or manner of making an affirmation (or an oath),[3] but it is reasonably inferable that what was intended was the same sort of formal, conscience-arousing, express and unequivocal personal commitment—in the case of a witness, to tell the truth—made before an appropriate officer, as is involved in taking an oath, *but* without the latter's invocation or involvement of any form of deity or religious obligation.[4]

This is not to say that some particular nonessential aspect of the form of what is tendered as an affirmation within the foregoing general definition may not nonetheless be, to the person called upon to make it, the equivalent of an oath invoking a deity or religious obligation. To some the word "affirm" may have the same sort of *religious* significance that the word "swear" does to others; similarly, to some the raising of a hand on such an occasion may constitute the making of a religious sign. *See Ferguson v. CIR*, 921 F.2d 588 (5th Cir.1991) (witness considers use of the word "affirm" to be prohibited by the same Biblical directives that preclude use of "swear"); *Gordon v. State of Idaho*, 778 F.2d 1397, 1400, 1401 (9th Cir.1985) (witness Gordon had "religious objection to taking an oath or using the word 'affirmation.' The court abused its discretion in insisting that Gordon use either the word 'swear' or 'affirm' in light of Gordon's sincere religious objections"; "Gordon has demonstrated that raising his right hand and swearing an oath or making an affirmation violates his sincerely-held religious beliefs"); *United States v. Looper*, 419 F.2d 1405 (4th Cir.1969) (witness, member of Radio Church of God, objects on religious grounds to holding up his hand, as

the following Oath or Affirmation—'I do solemnly swear (or affirm) that I will faithfully execute ...'"; Amendment Four, providing "no warrants shall issue, but upon probable cause, supported by Oath or affirmation."

**2.** *Cf. Torasco v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (striking down, under Fourteenth Amendment, Maryland requirement that state officers make "a declaration of belief in the existence of God" without reaching question whether Article VI's "no religious Test" language applies to state as well as federal officers, but inferentially relying by analogy on the same principle).

**3.** With the sole exception of the unique presidential oath or affirmation.

**4.** *See, e.g.,* 58 Am.Jur.2d, Oath and Affirmation, § 3 at 1048–49:
"While an oath, in its strict sense, involves the idea of calling on God to witness what is averred as truth, an affirmation is an undertaking to tell the truth equally as solemn as the oath, but does not invoke the Deity.... The affirmation has evolved as an alternative for those who are unable to take the religious oath, either because the oath conflicts with their religious principles or because they do not subscribe to any religion at all." (Footnotes omitted).
*See also id.* at § 6, p. 1050: "The affirmation has the same purpose [as an oath]: to bind the conscience. The only difference is that the af-

firmation does not impress the person taking it with a sense of *religious* obligation." (Footnote omitted).
*See also* Wright & Gold, *Federal Practice and Procedure: Evidence* § 6044 at 274–75:
"Rule 603 [Federal Rules of Evidence] does at least suggest *two necessary characteristics* of both oaths and affirmations. First, they are declarations to tell the truth. This means that an oath or affirmation must contain an unequivocal promise or commitment to relate the truth. Second, these declarations must be administered in a solemn manner calculated to awaken the conscience and remind the witness of his duty to speak the truth.
"The manner in which the conscience of the witness is awakened by an oath, however, differs from the manner in which that effect is produced by an affirmation and has a significant effect on both form and content. In the case of an oath, the witness appeals to God for assistance or otherwise invokes God in connection with his promise to tell the truth. God is involved for the purpose of impressing the witness with the seriousness of the occasion and with the threat of divine punishment for lying. An affirmation does not invoke God. Rather, the conscience of the witness is aroused by the solemn manner in which the declaration is given and received." (Footnotes omitted; emphasis added).

well as to any oath or affirmation that has "'God's name in it'"). Of course, these examples do not exhaust the genre. *See, e.g., Moore v. United States*, 348 U.S. 966, 75 S.Ct. 530, 99 L.Ed. 753 (1955) (error to prevent testimony by member of Harshmanite Church who declined "because of religious scruples, to use the word 'solemnly' in affirming to tell the truth"; "[t]here is no requirement that the word 'solemnly' be used in the affirmation").

In marked contrast to the foregoing, however, there may be those—and nothing in this record suggests that appellant O'Hair is not among them—who object to formally making, to a public official authorized to administer an oath or affirmation, *any sort* of express declaration of unequivocal personal commitment to tell the truth, *on the basis that any such exercise* by its very nature is religious in character (or contravenes the objector's religion) so that by engaging in it the person either expresses a belief in religion (or a religious belief) that he does not have or does something forbidden by his religion. Purely for ease of reference, I refer to this variety of objection as a "generic" objection. I conclude that the Constitution does not mandate that such a generic objection be sustained, but rather permits the government to require a thus-objecting witness to formally make to the appropriate officer some express declaration of unequivocal personal commitment to tell the truth.[5] In my view, the accommodation of religious and expressive freedom with the needs of civil administration has in essence been made in the constitutional provisions allowing affirmations in lieu of oaths, but requiring one or the other while prohibiting religious tests.

Thus far my ultimate conclusions do not depart significantly, if at all, from those of the majority, however different may be the roads we have travelled in arriving there.

From here on, however, the destinations are distinct.

Judge Herman advised O'Hair that he respected her "right to exercise your constitutional rights to freedom of religion and, therefore, I will offer an affirmation without any recognition or any statement, *any reference to God or anything of that nature*, and at this time I would like you to raise your hand and be affirmed by the Court" (emphasis added). O'Hair replied "I cannot affirm, sir. That is just as religious as an oath." Judge Herman then advised "I am merely asking you to affirm that whatever questions would be propounded to you, that you will give true answers." O'Hair responded "I am trying to evade participating in a religious statement"; Judge Herman stated "I am not asking you to participate in a religious statement"; O'Hair then asserted "an affirmation, my understanding, is a religious statement"; to which Judge Herman rejoined "the Court does not agree with you on that matter."

There is no showing that O'Hair ever made anything other than a generic objection to the entire affirmation process. She never told Judge Herman that she objected to the particular word "affirm," or to raising her hand, or to any identified specific aspect of what she was being asked to do. Most significantly, O'Hair never informed Judge Herman, expressly or implicitly, that she *was* willing to formally make to him *any sort* of express declaration of personal commitment to tell the truth or that "whatever questions would be propounded to you, that you will give true answers."[6] Nor is there any indication that Judge Herman took advantage of or tricked O'Hair. On the contrary, Judge Herman was patient and engaged in dialogue with her, and did not cut her off; she was obviously prepared for the occasion and was represented by counsel.

---

5. Nor do I read the majority opinion as holding otherwise.

6. Similarly, there is no suggestion that Judge Herman understood O'Hair to be merely making a specific objection to the word "affirm" (or to the raising of her hand) and to be willing to formally make to him some sort of express

declaration of personal commitment to tell the truth if it but omitted that specific word (and/or gesture); or that had Judge Herman so understood he would nevertheless have insisted on use of the word "affirm" (or on hand raising).

In this respect, the present case is far removed from those decisions relied on by the majority. In *Moore* the defendant, a member of the Harshmanite Church, was not allowed to testify as he had "declined, because of religious scruples against oath taking, to use the word 'solemnly' in affirming to tell the truth." The Supreme Court reversed the conviction on direct appeal, observing "[t]here is no requirement that the word 'solemnly' be used in the affirmation." Thus there was a specific objection to a specific word, and, inferentially, a manifested willingness to affirm without use of that specific word. The *Looper* court relied on *Moore*, and reversed a conviction on direct appeal, because the defendant, a member of the Radio Church of God, was not allowed to testify when he refused the judge's direction that he "hold up his right hand and appeal to God," although the defendant informed the court "I can't if it has God's name in it. If you ask me if I'll tell the truth, I can say that" and "I can't hold up my hand, Judge." There the demanded form was facially religious, specific objection was made, and there was an affirmative indication of a willingness to make a declaration in which the specifically objected-to matters were removed. A divided Ninth Circuit panel in *Gordon* relied on *Moore* and *Looper* in reversing on direct appeal the dismissal of a civil action due to the *pro se* plaintiff's refusal to take an affirmation in the precise form, including the word "affirm," which the district court had specified "despite Gordon's religious objection to ... using the word 'affirmation.'" 778 F.2d at 1400. The majority held that "[t]he court abused its discretion in insisting that Gordon use ... the word ... 'affirm' in light of Gordon's sincere religious objections." *Id.* Again, there was a specific objection to a specific word.

In our recent *Ferguson* decision we reversed on direct appeal a Tax Court decision for the government, holding that that court erred in refusing to allow the *pro se* taxpayer Ferguson to testify when she would not use the word "affirm," which she regarded as equally prohibited by the Bible as the word "swear." The Tax Court gave her almost no chance to make any explanation and refused to consider her tendered form of declaration taken from that approved by the Louisiana Supreme Court in *Staton v. Fought,* 486 So.2d 745 (La.1986). We relied on *Moore, Looper,* and *Gordon,* and observed concerning the latter: "Like Ms. Ferguson, Gordon objected to using either the word 'swear' or 'affirm' and offered an alternative statement. The Ninth Circuit held that the trial judge abused his discretion by refusing to even consider Gordon's proposed alternative." *Ferguson,* 921 F.2d at 589. Plainly, *Ferguson* does not compel the result here, for there the *pro se* witness, unlike the counseled O'Hair, affirmatively indicated her willingness to make a satisfactory declaration to the judge.

Further, it must be recalled that *Moore, Looper, Gordon,* and *Ferguson* are all direct federal appeals. This is a section 1983 suit challenging the actions of a state judge in a previous state proceeding before him. Neither *Moore* nor *Looper* purports to invoke constitutional principles. While *Gordon* and *Ferguson* do invoke the First Amendment, they clearly do so in the context of applying and interpreting the rather open-ended provisions of Fed.R.Evid. 603 (and related Federal Rules of Civil Procedure). Nor do either *Gordon* or *Ferguson* purport to be *constitutionally* based *insofar* as they may expressly or impliedly speak to the matter of what burden rests on the judge, and what on the objecting party, to make their respective positions clear to one another. Indeed, *Gordon* observes "[b]y failing to explore less restrictive means of assuring truthful deposition testimony, the district court *abused its discretion....*" *Id.,* 778 F.2d at 1401 (emphasis added). In *Ferguson* we relied heavily on *Gordon,* and inferentially adopted the same approach. Thus, *Ferguson* observes that if the Tax Court "had attempted to accommodate Ms. Ferguson by inquiring into her objections and considering her proposed alternative, the entire matter might have been resolved," and particularly noting in this connection that "Ms. Ferguson was proceeding *pro se.*" *Ferguson,* 921 F.2d at 590–91.

There is simply no warrant in principle or authority for transmuting an "abuse of discretion" into a constitutional mandate. Moreover, I find nothing to support the notion—necessarily implicit in the majority's holding—that a state is constitutionally barred from requiring a prospective witness or juror, especially one represented by counsel, to adequately articulate each particular, specific aspect of a proffered oath or affirmation to which there is objection and the reasons for each objection.

O'Hair, though represented by counsel and given full opportunity to do so, made no objection to any specific, identified particular word or gesture in the procedure designed to have her make a formal declaration to the judge of her personal commitment to tell the truth; she suggested no alternate form; and she never indicated *any* willingness to make *any* form of such a declaration. Nothing establishes that O'Hair had (or, indeed, has) anything other than a generic objection to the procedure. In these circumstances, Judge Herman did not violate the Constitution by insisting that O'Hair be either sworn or affirmed.

Finally, it also seems to me that in any event it is wholly inappropriate for this Court to grant O'Hair declaratory relief against Judge Herman. Judge Herman is the sole defendant, and O'Hair is the sole plaintiff, with respect to whom we grant such relief. No one else is benefitted or bound thereby. The incident made the basis of this suit took place, and concluded, more than three years ago. Except as regards that discrete, completed incident, there is no pending dispute or relationship between Judge Herman and O'Hair. In his dealings with O'Hair on that particular previous occasion, it is apparent that Judge Herman, insofar as the majority finds his conduct unconstitutional, followed no preconceived set or standard manner of proceeding (either of his own creation or as specified by state or local law), but rather acted entirely ad hoc. He was faced with a situation and dealt with it as best he could.

There is no indication that, should the matter again arise, he would not of his own proceed with enough more "back-and-forth interaction" to achieve the majority's blessing. More significantly, there is no showing of any real and immediate threat that O'Hair will again be called upon by Judge Herman to take an oath or affirmation. There is nothing to indicate that O'Hair has ever been before Judge Herman since the incident in question, or that there is anything pending or threatened that is likely to bring her before him. Travis County, where O'Hair and Judge Herman live, has over 500,000 residents, 13 district judges, 7 county-court-at-law judges, 1 probate court judge, and five justices of the peace.

In circumstances such as these, O'Hair would appear to lack standing to seek declaratory relief against Judge Herman. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Rocky v. King*, 900 F.2d 864 (5th Cir.1990); *Brown v. Edwards*, 721 F.2d 1442, 1446–47 (5th Cir. 1984); *Northern Virginia Women's Medical Center v. Balch*, 617 F.2d 1045, 1048–49 (4th Cir.1980). Even if there were standing, the granting of declaratory relief "rests in the sound discretion of the trial court." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2759 at 645. Considerations of comity and the gross intrusiveness of the remedy—micromanaging a state judge's future handling of any oath or affirmative process involving a particular individual—balanced against the remote and speculative nature of any future relevant controversy between the parties, strongly point to exercising any such discretion so as to deny declaratory relief.[7] Cf. *Seniors v. Arnold*, 284 F.2d 106 (5th Cir.1960). At the very least, such relief should not be granted on appeal without having been first addressed by the trial court.

---

7. The only real practical effect of the declaratory relief is to make Judge Herman personally liable for O'Hair's attorneys' fees, likely a far more significant amount than any damages she might have recovered from him (under the majority's analysis) had he not had qualified or absolute immunity.

I would uphold the judgment in Judge Herman's favor. And, in any event, I would not grant O'Hair declaratory relief against him. I accordingly dissent from the majority's contrary holdings.